UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| CRYSTAL CAMPBELL ) | |
| ) | |
| ) | CIVIL ACTION FILE NO. |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **JURY TRIAL DEMANDED** |
| MAYO CLINIC INC. ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## **COMPLAINT**

Plaintiff Crystal Campbell ("Ms. Campbell" or "Plaintiff") respectfully

submits this Complaint for Damages and Equitable Relief:

## **INTRODUCTION**

2.      Ms. Campbell is an African American female who was formerly

employed by Mayo Clinic Inc. ("Defendant") as Clinical Specialty Representative

("CSR") in the Southern Region of the Gastroenterology/Infectious Disease

Division.  Despite satisfactory performance in her role, Ms. Campbell suffered

disparate treatment, and termination, based on her race and gender.

3.      Plaintiff files this Complaint for declaratory, injunctive, and monetary

relief against Defendant for race discrimination in violation of 42 U.S.C. § 1981 and

Title VII of the Civil Rights Act of 1964 ("Title VII) and sex discrimination in violation of Title VII. Plaintiff asserts mixed motive and single motive discrimination claims

## JURISDICTION AND VENUE

4.     Plaintiff brings this action pursuant to 42 U.S.C. § 1981, as well as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

5.     The unlawful violations of Plaintiff's civil rights were committed within the Northern District of Georgia.  Venue is proper in this Court under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## ADMINISTRATIVE EXHAUSTION

6.     Ms. Campbell has satisfied all administrative prerequisites to perfect her claims of discrimination and retaliation under Title VII. Specifically, she has timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging race and sex discrimination and retaliation and timely filed this lawsuit following receipt of a Notice of Right to Sue Letter for her claims under Title VII of the Civil Rights Act of 1964.

2

## PARTIES

7.     Ms. Campbell is now and was at all times relevant to this action, a citizen of the United States entitled to bring actions of this type and nature. Plaintiff is now and was at all times relevant to this action a resident of the state of Georgia.

8.     Defendant Mayo Clinic Inc. is a foreign non-profit corporation that is registered with the Georgia Secretary of State.  Its principal place of business is located at 200 First Street, S.W., Rochester, MN, 55905. Its registered agent for service of process is CT Corporation System.  Process can be served at 289 S Culver St, Lawrenceville, GA, 30046-480192.

## STATEMENT OF FACTS

9.     Ms. Campbell is an African American female.

10.     Before joining Defendant, Ms. Campbell had over 19 years of health care experience, including more than a decade in sales with multiple MVP and leadership awards.  Ms. Campbell earned a Bachelor of Science degree in Chemical Engineering from Howard University where she graduated Magna Cum Laude.  She earned her Master of Science degree in Biomedical Engineering from the University of Virginia.

3

11.     Defendant hired Ms. Campbell effective March 7, 2017 as a Clinical Specialty Representative ("CSR") in the Southern Region of the Gastroenterology/Infectious Disease Division.

12.     Ms. Campbell was recommended for the position by a white, female co-worker in this Division, Deanna Pryor, who was impressed with Ms. Campbell's sales results at their prior employer.

13.     Defendant hired Ms. Campbell after several rounds of interviews with multiple individuals including her supervisor, Clark Robinson ("Robinson"). Robinson was one of two people who interviewed her in Georgia.

14.     Ms. Campbell then travelled to Minnesota to interview with a five-person panel that included Robinson.  Immediately after this panel interview, she met with John Heywood, Robinson's supervisor, and was offered the job on the spot.

15.     At both of these interviews, Ms. Campbell saw a white male, presumably the other applicant for the position, enter and exit the interview room before or after her.

16.     As Ms. Campbell was leaving after her final interview, Robinson requested that, if she ran into the other (white, male) applicant at the small airport

4

on the way back from the interview, she not disclose her job offer because he wanted to let the applicant know about the hiring decision.

17.     Robinson's statements confirmed to Ms. Campbell that the white male was another applicant and suggested to her that Robinson may have supported his candidacy over hers.

18.     Robinson made it a point to tell Ms. Campbell that his supervisor, Heywood, wanted to hire her (which Ms. Campbell perceived to mean that by implication, Robinson did not).

19.     Once Ms. Campbell began working for Defendant, Robinson almost immediately began to subject her to stringent oversight and burdensome administrative tasks that he did not require of other, white employees.

20.     Only Ms. Campbell and the other African American female member of her team were subjected to this level of scrutiny.

21.     Additionally, an African American, female CSR on the Neurology Team in Georgia also found Robinson's conduct towards her to be blatantly disrespectful when they had a Local Area Team Meeting in December 2018 at which he was present.

22.   Robinson made remarks that suggested he viewed this individual as a stereotypical angry black woman. However, because this individual was not supervised directly by Robinson and her tenure preceded his, she was not subject to the same type and scope of treatment that Ms. Campbell experienced.

23.   The standards Robinson seemed to require of Ms. Campbell were also always shifting, such that Ms. Campbell was never sure she was meeting his arbitrary demands.

24.    By way of example, Robinson would complain that Ms. Campbell's semi-monthly reports were insufficiently detailed, but when she added detail, he would then complain that they were too detailed.

25.   Ms. Campbell wanted to do her job well and asked Robinson for a "best practices" example of what he wanted on these reports.

26.   Robinson provided an example from a white CSR that contained almost no detail at all.

27.   Ms. Campbell responded by providing a less detailed report that faithfully replicated the "best practices" outline Robinson gave to her.

28.    Robinson, however, still was not satisfied even though Ms. Campbell followed the format he had provided her which format apparently was acceptable "best practices" for a white CSR.

29.    Robinson also denied Ms. Campbell resources that he provided to other, white CSRs and which would have improved her sales numbers.

30.    Defendant offers certain streamlined shipping procedures so that provider clients can transfer specimens to Defendant's laboratory facilities more efficiently.  This offering makes Defendant's products more attractive to clients but, to offer it, Ms. Campbell needed Robinson's permission.

31.    Ms. Campbell requested permission for the streamlined shipping procedures several times, but Robinson never approved her requests.

32.    When a white CSR—who began her job the same day as Ms. Campbell—made these requests for the streamlined shipping procedures, Robinson approved them.

33.    In Ms. Campbell's first, and only, annual evaluation on March 6, 2018, she received the highest possible overall rating ("achieves expectations").

34.     Ms. Campbell achieved expectations in 31 out of 33 competencies related to putting patients first.  She also achieved expectations in five out of six competencies related administrative/other skills.

35.     Robinson continued to use the CRM entries—one of the few quantitative metrics for CSRs, along with sales figures—to find fault with Ms. Campbell.

36.     When Ms. Campbell returned from a vacation in September 2018, Robinson claimed that she had failed to enter client appointment data for the preceding two weeks.

37.     However, Ms. Campbell attended a mandatory sales meeting during the third week of August 2018 and was on approved vacation time for the following week.  Therefore, Robinson knew she had no client appointment data to enter but still criticized her.

38.     On information and belief, many white employees flatly disregarded CRM data entry, and other administrative tasks required of Ms. Campbell but, to her knowledge, suffered no consequences or reprimands.

39.     Defendant's discriminatory continued when it placed Ms. Campbell on an unjustified performance improvement plan ("PIP").

40.    The PIP specifically stated that it was an "informal coaching document" and would not be sent to Human Resources "unless formal corrective action processes are initiated as a result of non-achievement."

41.    Despite its unjustified nature, Ms. Campbell successfully completed the plan.

42.    Despite Ms. Campbell's successful completion of the PIP, Defendant, through Robinson, terminated Ms. Campbell via telephone on February 22, 2019.

43.    Robinson was insistent that this phone call occur at this time; even going so far as to interrupt Ms. Campbell during a client sales meeting to see if she was available.

44.    The hasty timing of Robinson's termination decision reflects his animus and that his alleged reasons for terminating Ms. Campbell were pretextual.

45.    The latest sales numbers were published earlier that week and showed that Ms. Campbell's sales numbers—and her rankings within the team—had improved.  By terminating her two weeks before it was necessary for him to note this improvement in her annual performance appraisal, Robinson sought to justify claiming her termination was based on performance.

46.     Further evidencing the animus reflected in the timing of the termination, Defendant terminated Ms. Campbell was terminated just shy of her two-year anniversary with Defendant meaning that she was disqualified from its pension benefits.

47.     Defendant failed to follow its own policies for an alleged performance related termination.

48.     Defendant has a progressive corrective action process that progresses as follows: (1) Notification of Corrective Action, (2) Written Warning, (3) Final Written Warning and (4) Termination (with notes detailing reason and what led to termination).

49.     Ms. Campbell did not receive a formal corrective action at any level; she received no final incident, prior warning, or notification that her job was in jeopardy.

50.     With no assertion of misconduct by Ms. Campbell, an immediate termination was unwarranted and represents a discriminatory deviation from Defendant's policies.

51.     Defendant claimed Ms. Campbell's termination was due to "failure to meet performance expectations."

52.     At this time, however, Ms. Campbell's sales figures were such that she was ranked 16 out of 28 CSRs.

53.     On information and belief, no CSRs with sales numbers or rankings below Ms. Campbell's were terminated.

54.     One coworker —a white male—performed demonstrably worse than Ms. Campbell during this period but kept his job.

55.     Another white male, whose performance was ranked in last place, was not terminated, and on information and belief was promoted to a Hospital Account Executive role in September of 2019.

56.     A white female CSR, who was ranked well below Ms. Campbell was also not terminated and was actually selected to participate in a coveted leadership development stretch assignment just prior to Ms. Campbell's termination.

## <u>COUNT I</u>
### <u>42 U.S.C. § 1981 – Race Discrimination</u>

57.     All preceding paragraphs are incorporated herein by reference.

58.     At all times material to this Complaint, Plaintiff and Defendant were parties to an employment agreement under which Plaintiff worked for Defendant and Defendant compensated her for her work.

59.     Plaintiff is African American.

60.     Plaintiff performed her obligations under her employment agreement.

61.     42 U.S.C. § 1981 prohibits Defendant from discriminating against Plaintiff on the basis of race with regard to the making and enforcing of her employment agreement with Defendant.

62.     The above-pleaded discriminatory conduct toward Plaintiff, including, but not limited to, demeaning and exclusionary treatment, unjustified criticism, excessive scrutiny, and her discriminatory termination based on race constitutes unlawful race discrimination against Plaintiff in the terms and conditions of her employment in violation of 42 U.S.C. § 1981.

63.     Defendant violated Plaintiff's rights under 42 U.S.C. § 1981 by subjecting her to disparate treatment and terminating her employment because of her race.

64.     Defendant undertook its conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, or additionally, and in the alternative, undertook its conduct recklessly with respect to Plaintiff and her federally protected rights, entitling Plaintiff to recover punitive damages against Defendant.

65.     Defendant's actions constitute unlawful intentional race discrimination in violation of 42 U.S.C. § 1981.

66.     Defendant willfully and wantonly disregarded Plaintiff's federally protected rights and Defendant's discrimination against Plaintiff was undertaken in bad faith.

67.     As a direct and proximate result of Defendant's violations of 42 U.S.C. § 1981, Plaintiff has suffered damages including lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

68.     Accordingly, Plaintiff is entitled to the equitable and monetary relief set forth in the following prayer for relief for Defendant's violation of her rights under 42 U.S.C. § 1981.

## COUNT II
## Title VII Race Discrimination

69.     Paragraphs 1 through 56 are incorporated herein by reference.

70.     Plaintiff is in a protected class based on her race (Black).

71.     Plaintiff is an "employee" as defined by Title VII, 42 U.S.C. § 2000e *et seq.*

72.     Plaintiff was qualified for the position to which she was hired.

13

73.     Defendant is an "employer" as defined by Title VII, 42 U.S.C. § 2000e *et seq.*

74.     Defendant discriminated against Plaintiff in the terms and conditions of her employment when, among other things, its leaders treated her differently and less favorably because of her race and terminated her employment.

75.     Defendant undertook this unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages against Defendant.

76.     Additionally, or in the alternative, Defendant undertook its unlawful conduct recklessly with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages.

77.     As a direct and proximate result of the Defendant's actions, Plaintiff suffered damages including stress, inconvenience, loss of income and benefits, humiliation, and other indignities.

78.     Plaintiff is entitled to an award of back pay and benefits, compensatory damages, attorney's fees, punitive damages, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

## COUNT III
## Title VII Sex Discrimination

79.    Paragraphs 1 through 56 are incorporated herein by reference.

80.    Plaintiff is in a protected class based on her sex (female).

81.    Plaintiff is an "employee" as defined by Title VII, 42 U.S.C. § 2000e

*et seq.*

82.    Plaintiff was qualified for the position to which she was hired.

83.    Defendant is an "employer" as defined by Title VII, 42 U.S.C. § 2000e

*et seq.*

84.    Defendant discriminated against Plaintiff in the terms and conditions of her employment when, among other things, it treated her differently and less favorably because she was a female as compared to her male peers.

85.    Defendant undertook this unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages against Defendant.

86.    Additionally, or in the alternative, Defendant undertook its unlawful conduct recklessly with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages.

15

87.     As a direct and proximate result of the Defendant's actions, Plaintiff suffered damages including stress, inconvenience, loss of income and benefits, humiliation, and other indignities.

88.     Plaintiff is entitled to an award of back pay and benefits, compensatory damages, attorney's fees, punitive damages, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A. That a jury trial be had on all issues so triable;

B.  Back pay and benefits;

C.  Front pay and benefits;

D.  Compensatory damages;

E.  Punitive damages;

F.  Declaratory relief;

G. Injunctive relief to prevent Defendant from engaging in such discriminatory and retaliatory conduct in the future;

H.  Costs incurred in bringing this action, including Plaintiff's attorneys' fees;

I.   Interest on all monetary awards; and

J.   Such other and further relief as the court deems appropriate under the circumstances of this case.

Respectfully submitted this 8th day of April 2021.

BUCKLEY BEAL, LLP

*/s/ Thomas J. Mew*
Thomas J. Mew
GA Bar No. 503447
tmew@buckleybeal.com

600 Peachtree Street NE
Suite 3900
Atlanta, GA 30308
Telephone: (404) 781-1100
Facsimile: (404) 781-1101